# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724 |
| BACLOFEN<br><br>THIS DOCUMENT RELATES TO:<br><br>*DIRECT PURCHASER ACTIONS* | HON. CYNTHIA M. RUFE |
| ROCHESTER DRUG CO-OPERATIVE, INC. and FWK HOLDINGS, L.L.C., on behalf of themselves and all others similarly situated,<br><br>                        Plaintiffs,<br><br>v.<br><br>PAR PHARMACEUTICALS, INC.; TEVA PHARMACEUTICALS USA, INC.; and UPSHER-SMITH LABORATORIES, INC.,<br><br>                       Defendants. | Civil Action No.<br><br><br><br>JURY TRIAL DEMANDED |

## DIRECT PURCHASER CLASS ACTION COMPLAINT

REDACTED PUBLIC VERSION
CONTAINS INFORMATION REDACTED PURSUANT
TO MDL 2724 PROTECTIVE ORDER

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   JURISDICTION AND VENUE ............................................................................3

III.  PARTIES ..............................................................................................................4

      A.    Plaintiffs ...................................................................................................4

      B.    Defendants ...............................................................................................4

      C.    Agents and Co-Conspirators ....................................................................5

IV.   INTERSTATE TRADE AND COMMERCE .......................................................6

V.    FACTUAL ALLEGATIONS ...............................................................................7

      A.    The Generic Drug Market Is a Commodities Market, Where Competition
            Historically Has Been Keen. ....................................................................7

            1.    Generic drugs should lead to lower prices. ....................................7

            2.    Prescription drug prices in the United States are governed by institutional
                  safeguards, which are intended to keep drug prices competitive ................9

      B.    Consolidation in the Generic Pharmaceutical Industry. ........................11

      C.    Defendants' Dominance in the Generic Baclofen Market Permitted Them to Fix
            Prices, and Their Abrupt Price Increases Are Otherwise Inexplicable. ................12

            1.    Defendants' collective market dominance permitted them to collude. ......13

            2.    Defendants' effective prices were remarkably stable before skyrocketing
                  in the Class Period. ......................................................................13

            3.    There are no shortages or other market changes that would justify the price
                  increases. ......................................................................................19

      D.    Defendants' Anticompetitive Activities ................................................21

            1.    Defendants have ample opportunities to communicate through trade
                  organizations, and have availed themselves of those opportunities to
                  collude. .........................................................................................21

            2.    Industry Commentary .................................................................22

E.      Government Investigations ..................................................................................23

VI.    THE BACLOFEN MARKET IS HIGHLY SUSCEPTIBLE TO COLLUSION..............31

VII.   CLASS ACTION ALLEGATIONS ................................................................................34

VIII.  ANTITRUST INJURY ....................................................................................................36

IX.    CLAIM FOR RELIEF – VIOLATION OF SECTION 1 OF THE SHERMAN ACT......37

PRAYER FOR RELIEF ............................................................................................................38

JURY TRIAL DEMANDED......................................................................................................39

## I.    INTRODUCTION

1.    Plaintiffs Rochester Drug Co-Operative, Inc. and FWK Holdings, L.L.C., on behalf of themselves and all others similarly situated, brings this Class Action Complaint on behalf of a Class (defined below) of direct purchasers who purchased generic baclofen in tablet form directly from Defendants Par Pharmaceuticals, Inc., Teva Pharmaceuticals USA, Inc., or Upsher-Smith Laboratories, Inc.

2.    This is a civil action seeking treble damages arising out of the Defendants' unlawful scheme to fix, maintain, and stabilize the prices, rig bids, and allocate customers for baclofen tablets.  As set forth below, Defendants' scheme violates Section 1 of the Sherman Act, 15 U.S.C. § 1.

3.    Baclofen is a commonly prescribed drug in the United States, used to treat muscle spasms and cramping, particularly for people with multiple sclerosis, injury, or disease of the spinal cord.  It is available in tablet form (dosage: 10 and 20 mg).

4.    Generic versions of baclofen have been available in the United States since the 1980s.  Defendants dominate the market for baclofen.

5.    Beginning on approximately February 1, 2014, and continuing today (the "Class Period"), Defendants and co-conspirators engaged in an overarching anticompetitive scheme in the market for baclofen tablets to artificially inflate prices through unlawful agreements between and among would-be competitors.  Defendants caused the price of baclofen tablets to dramatically and inexplicably increase as much as █████ higher than January 2014 prices, as alleged in paragraphs 56-67.  These increases were the result of an agreement among Defendants to increase pricing and restrain competition for the sale of baclofen in the United States.  As alleged in paragraphs 72-77 below, the agreement was furthered by discussions held at trade association meetings and events.

6.     Plaintiffs' allegations are based on personal knowledge of these matters relating to itself and upon information and belief as to all other matters.  Part of Plaintiffs' allegations are based on information made public during government investigations of Defendants for alleged unlawful conduct in the generic drug industry.

7.     Defendants' dramatic and unexplained price increases have resulted in extensive and ongoing scrutiny by federal and state regulators, including by the Antitrust Division of the United States Department of Justice ("DOJ"), the United States Senate, the United States House of Representatives, and 40 states' Attorneys General, as alleged in Paragraphs 81-97.  Indeed, the U.S. Government Accountability Office specifically cited baclofen as an example of a generic pharmaceutical that "experienced an extraordinary price increase."[1]

8.     The DOJ's 2014 investigation followed a congressional hearing and investigation prompted by the National Community Pharmacists Association's ("NCPA") January 2014 correspondence to the U.S. Senate Health Education Labor and Pensions ("HELP") Committee and the U.S. House Energy and Commerce Committee requesting hearings on the significant spike in generic drug pricing.[2]  The NCPA's news release reports price hikes on essential generic drugs exceeding 1,000% in some instances, according to its survey of over a thousand community pharmacists, resulting in patients being forced to leave their prescriptions at the pharmacy counter due to increased copays, and forcing more seniors into Medicare's coverage gap (or "donut hole") where they must pay far higher out-of-pocket costs.

---

[1] U.S. Government Accountability Office Report to Congressional Requesters, *Generic Drugs Under Medicare* (Aug. 2016) ("GAO Report"), *available at* http://www.gao.gov/assets/680/679055.pdf.

[2] News release, *Generic Drug Price Spikes Demand Congressional Hearing, Pharmacists Say* (Jan. 8, 2014), *available at* http://www.ncpanet.org/newsroom/news-releases/2014/01/08/generic-drug-price-spikes-demand-congressional-hearing-pharmacists-say.

9.      The direct, foreseeable, and intended consequence of Defendants' anticompetitive scheme was to cause Plaintiffs and Class Members to pay more for baclofen tablets than they otherwise would have paid in the absence of Defendants' unlawful conduct.  Were it not for Defendants' collusion to restrain or eliminate competition by engaging in a conspiracy to foreclose competition in the United States market for baclofen tablets, Plaintiffs and Class Members would not have paid supracompetitive prices for baclofen tablets.

10.     Plaintiffs seek damages incurred due to Defendants' and co-conspirators' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## II.    JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action as it arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15. Further, this Court has jurisdiction under 28 U.S.C. §§ 1331, 1337(a).

12.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c), because during the Class Period the Defendants transacted business throughout the United States, including in this District.

13.     During the Class Period, Defendants sold and distributed generic drugs in a continuous and uninterrupted flow of interstate commerce, which included sales of baclofen in the United States, including in this District.  Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District.

14.     This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in the selling and distribution of baclofen throughout the United States, including in this District; (c) had and maintained substantial contacts within the United States, including in

this District; and/or (d) was engaged in an unlawful conspiracy to inflate the prices for baclofen

that was directed at and had the intended effect of causing injury to persons residing in, located

in, or doing business throughout the United States, including in this District.

### III.    PARTIES

#### A.    Plaintiffs

15.    Plaintiff FWK Holdings, L.L.C. ("FWK") is an Illinois limited liability company

located in Glen Ellyn, Illinois.  FWK is the assignee of antitrust claims possessed by Frank W.

Kerr Company ("Kerr") and brings this action as successor-in-interest to Kerr's claims arising

from its purchase of baclofen during the Class Period directly from one or more of the

Defendants at artificially and unlawfully inflated prices.  As a result of Defendants' antitrust

conspiracy, FWK/Kerr paid supracompetitive prices for baclofen and was injured by the illegal

conduct alleged herein.

16.    Plaintiff Rochester Drug Co-Operative, Inc. ("RDC") is a stock corporation duly

formed and existing under the New York Cooperative Corporations Law, with its principal place

of business in Rochester, New York.  During the Class Period, as defined below, RDC purchased

baclofen directly from one or more of the Defendants at artificially and unlawfully inflated

prices.  As a result of Defendants' antitrust conspiracy, RDC paid supracompetitive prices for

baclofen and was injured by the illegal conduct alleged herein.

#### B.    Defendants

17.    Defendant Par Pharmaceuticals, Inc. ("Par") is a New York corporation with its

principal place of business in Chestnut Ridge, New York, and is the successor-in-interest to

Generics Bidco I, LLC d/b/a Qualitest Pharmaceuticals, Inc. ("Qualitest").  In September 2016,

Qualitest merged into Par.  In this complaint, Par and Qualitest will be referred to collectively as

"Par." During the Class Period, Par sold baclofen in this District and throughout the United States.

18.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. During the Class Period, Teva sold baclofen in this District and throughout the United States.

19.     Defendant Upsher-Smith Laboratories, Inc. ("Upsher-Smith") is a Minnesota corporation with its principal place of business in Maple Grove, Minnesota. During the Class Period, Upsher-Smith sold baclofen in this District and throughout the United States.

20.     Defendants have engaged in the conduct alleged in this Complaint, and/or the Defendants' officers, agents, employees, or representatives have engaged in the alleged conduct while actively involved in the management of Defendants' business and affairs.

**C.     Agents and Co-Conspirators**

21.     Each Defendant acted as the principal of, or agent for, all other Defendants with respect to the acts, violations, and common course of conduct described in this Complaint

22.     Various other persons, firms, entities, and corporations, not named as Defendants in this Complaint, have participated as co-conspirators with Defendants in the violations alleged herein, and have aided, abetted, and performed acts and made statements in furtherance of the conspiracy.

23.     The true names and capacities of additional co-conspirators, whether individual, corporate, associate, or representative, are presently unknown to Plaintiffs. Plaintiffs may amend this Complaint to allege the true names and capacities of additional co-conspirators as they are discovered.

24.     At all relevant times, other persons, firms, and corporations, referred to herein as "co-conspirators," the identities of which are presently unknown, have willingly conspired with Defendants in their unlawful monopolization as described herein.

25.     The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or were ordered or committed by duly authorized officers, managers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

26.     The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

## IV.     INTERSTATE TRADE AND COMMERCE

27.     Defendants are the leading manufacturers and suppliers of baclofen tablets sold in the United States.

28.     Baclofen tablets are produced by or on behalf of Defendants or their affiliates in the United States or overseas.

29.     During the Class Period, Defendants, directly or through one or more of their affiliates, sold baclofen tablets throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

30.     The activities of Defendants and their co-conspirators were within the flow of, intended to, and had a substantial effect on interstate commerce in the United States.

31.     Defendants' and their co-conspirators' conduct, including the marketing and sale of baclofen tablets, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

32.    The conspiracy alleged in this Complaint has directly and substantially affected interstate commerce in that Defendants deprived Plaintiffs of the benefits of free and open competition in the purchase of baclofen tablets within the United States.

33.    Defendants' agreement to inflate, fix, raise, maintain, or artificially stabilize prices and allocate customers for baclofen tablets, and their actual inflating, fixing, raising, maintaining, or artificially stabilizing baclofen tablets prices and customer allocation, were intended to have, and had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States.

## V.    FACTUAL ALLEGATIONS

**A.    The Generic Drug Market Is a Commodities Market, Where Competition Historically Has Been Keen.**

### 1.    Generic drugs should lead to lower prices.

34.    Generic drugs provide a lower-cost but bioequivalent alternative to brand drugs. Before any generic drug can be marketed, the Food and Drug Administration (the "FDA") requires rigorous testing to ensure it has the same strength, quality, safety, and performance as the brand.  By law, generics must have the same amount of active ingredient and must be "therapeutically equivalent" to the brand, meaning they must meet exacting bioequivalence testing specifications so patients can expect "equal effect and no difference when [generics are] substituted for the brand name product." [3]

35.    To obtain marketing approval for a generic drug, an Abbreviated New Drug Application ("ANDA") must be filed with the FDA's Center for Drug Evaluation and Research, Office of Generic Drugs; "abbreviated" because so long as the ANDA includes data showing

---

[3] FDA, Drugs@FDA Glossary of Terms, *available at* http://www.fda.gov/Drugs/ InformationOnDrugs/ucm079436.htm#G.

bioequivalence to the brand, the ANDA sponsor can reference efficacy data supporting approval of the brand (described in the regulations as the "Reference Listed Drug" or "RLD" for short) instead of repeating all the same clinical trials itself. Upon the FDA's determination that bioequivalence to the brand has been established, the ANDA will be approved and may be marketed in the United States as substitutable with the RLD.

36.     Although equivalent from a safety and efficacy standpoint, generic versions of brand drugs are priced significantly below their brand counterparts, and because of this rapidly gain market share from the brand beginning immediately following launch. Indeed, in every state, pharmacists are permitted (and in many states required) to substitute a generic product for a brand product barring a note from a doctor that the brand product must be dispensed as written.

37.     It is well established in economic literature that competition by generic products results in lower prices for drug purchasers. In the period before generic entry, a brand drug commands 100% of the market share for that drug and the brand manufacturer can set the price free from competitive market forces. But once the first lower-priced generic enters, a brand drug rapidly loses sales due to automatic pharmacy counter substitution, and generics capture as much as 80% of the market or more within months of launch. And as more generics become available, generic prices only decline further due to competition among generics, and the brand drug's share of the overall market erodes even faster. These cost reductions to drug purchasers were the very legislative purpose behind the abbreviated regulatory pathway for generic approval.[4]

38.     Generic competition, under lawful and competitive circumstances, reduces drug costs by driving down the prices of both generic versions of the brand drug and the brand drug

---

[4] H.R. Rep. No. 98-857, pt. 1, at 1 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2647.

itself, and every year new generic drugs result in hundreds of billions of dollars in savings to consumers, insurers, and other drug purchasers.

39.     A Federal Trade Commission ("FTC") study found that in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug prices."  A mature generic market, such as the market for baclofen, has several generic competitors. Because each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiating feature and the basis for competition among manufacturers.[5]  Over time, generics' pricing nears the generic manufacturers' marginal costs.

40.     Generic competition usually enables purchasers to purchase generic versions of the brand drug at a substantially lower price than the brand drug. Generic competition to a single blockbuster brand drug product can result in billions of dollars in savings to direct purchasers, consumers, insurers, local, state, and federal governments, and others. Indeed, one study found that the use of generic medicines saved the United States healthcare system $1.68 trillion between 2005 and 2014.[6]

**2.     Prescription drug prices in the United States are governed by institutional safeguards, which are intended to keep drug prices competitive.**

41.     Ordinarily, the price for a consumer product is set by the retailer based on the amount the typical consumer is willing to pay.  But because of the unique features of the

---

[5] *See, e.g.*, FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact*, at 17 (Aug. 2011) ("[G]eneric drugs are commodity products marketed to wholesalers and drugstores primarily on the basis of price."); U.S. Cong. Budget Office, *How Increased Competition from Generic Drugs Has Affected Proceed and Returns in the Pharmaceutical Industry* (July 1998), *available at* https://www.cbo.gov/sites/default/files/105th-congress-1997-1998/reports/pharm.pdf.

[6] GENERIC PHARM. ASS'N, GENERIC DRUG SAVINGS IN THE U.S. (7th ed. 2015) at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

prescription drug marketplace, prescription drug pricing for most consumers is not determined between the retailer and the consumer.  Rather, because most consumers' prescription drug purchases are reimbursed by public or private health plans, the pricing for prescription drugs is determined by reimbursement agreements between these prescription drug payors, *i.e.*, health plans and their prescription benefit managers, and the pharmacies that dispense drugs to the payors' insured customers.

42.    Generic manufacturers typically report a Wholesale Acquisition Cost ("WAC") for their drugs.  WAC prices represent the manufacturer's benchmark or reported list price.  The WAC typically functions as the manufacturer's list or benchmark price in sales to wholesalers or other direct purchasers and typically do not include discounts that may be provided, *e.g.*, for volume sales.

43.    At one time, payors relied on cost-based pricing metrics to reimburse pharmacies that dispensed drugs to their insured customers, paying the dispensing pharmacies an amount based on the manufacturer's list price for the drug, plus a small mark-up and/or dispensing fee. Over time, however, it was learned that the list price for most generic drugs published by their manufacturers was substantially higher than the actual cost incurred by pharmacies to acquire the drugs.

44.    To reduce the cost of prescription drugs to the public, prescription drug payors developed Maximum Allowable Cost prices ("MACs") to determine the amount that pharmacies would be reimbursed for dispensing generic pharmaceuticals.  The MAC price refers to the maximum amount that a payor will reimburse a pharmacy for a given strength and dosage of a generic drug or brand drug that has a generic version available.  A MAC price thus represents the upper limit that a prescription drug payor will pay a pharmacy for a generic drug.

45.     Payors set the MAC pricing of a drug based on a variety of factors, including, most significantly, the lowest acquisition cost for each generic drug paid by retail pharmacies purchasing from a wholesaler for each of a drug's generic versions.

46.     MAC pricing is designed to incentivize pharmacies to purchase the least costly version of a generic drug available on the market, without regard to the manufacturer's list price. Because the reimbursement amount to a pharmacy is limited by the MAC price for a generic drug and each of its equivalents regardless of the pharmacy's acquisition cost, a pharmacy's profit will be reduced, or lost altogether, if it purchases other than the lowest cost generic product. Alternatively, if a retail pharmacy purchases the lowest priced generic version of the drug, it will maximize its profit.

47.     MAC pricing also incentivizes an individual generic manufacturer to refrain from unilaterally increasing its prices. Because MAC pricing bases reimbursement on the generic drug's lowest acquisition cost, a generic manufacturer that increases its price for a drug will lose sales to a competing generic manufacturer whose price remains constant.

48.     Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual generic manufacturer cannot significantly increase its price without incurring the loss of a significant volume of sales.

**B.     Consolidation in the Generic Pharmaceutical Industry.**

49.     Since 2005, consolidation has generally reduced the number of competitors in generic pharmaceutical markets. Consolidation reduces the number of potential competitors, rendering the market ripe for collusion.

50.     Generic pharmaceutical industry leader Teva, for example, acquired Ivax Corporation in 2006, Barr Laboratories in 2008, Ratiopharm—Germany's second largest generic drug producer— in 2010; and Allergan's generics business (including Actavis generics) in 2016.

Other major transactions that occurred during the same time period include Watson Pharmaceuticals' acquisition of Andrx Corporation in 2006; Daiichi Sankyo's purchase of a majority stake in Ranbaxy in 2008; Endo's 2010 acquisition of Qualitest; Perrigo's acquisition of Paddock Laboratories, Inc. in 2011; and Sandoz's acquisition of Fougera in 2012.

**C.    Defendants' Dominance in the Generic Baclofen Market Permitted Them to Fix Prices, and Their Abrupt Price Increases Are Otherwise Inexplicable.**

51.    The market for baclofen is mature, as generic versions have been on the market for decades.  In 2015 alone, Defendants' total revenue from direct purchases of baclofen was nearly ██████████.[7]

52.    A mature generic market, such as the market for baclofen, has several generic competitors.  As noted above, because each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiating feature and the basis for competition among manufacturers.  In a market free from collusive activity, over time, generics' pricing would naturally near (and stay near) the generic manufacturers' marginal costs.

53.    At all times relevant for this lawsuit, there have been at least three manufacturers of baclofen tablets on the market.  Under accepted economic principles of competition, when there are multiple generics on the market, prices should remain at highly competitive, historic levels, and would not increase as they did here absent anticompetitive conduct.  Drastic increases in baclofen tablet prices are themselves suggestive of Defendants' collective market dominance:

---

[7] Revenue, unit sales, and effective prices are obtained from QuintilesIMS Inc. ("IMS Health").  IMS Health is the largest vendor of physician prescribing data in the United States and is widely relied upon in the pharmaceutical industry and elsewhere.  "Effective prices" represent actual transaction prices, as reported by IMS Health.

if they did not already dominate the market, pricing excesses would be disciplined by losing

market share to non-colluding competitors.

     **1.**     **Defendants' collective market dominance permitted them to collude.**

     54.     During the Class Period, the Defendants dominated the baclofen market. 

     55.     In terms of revenue, in 2015, 

     **2.**     **Defendants' effective prices were remarkably stable before skyrocketing in the Class Period.**

     56.     Before the Class Period,

     57.     As illustrated below, Defendants' effective prices inexplicably increased sharply

beginning in February 2014, when Defendants attended a three-day generic pharmaceutical

manufacturers conference in Orlando, Florida:





58. **Upsher-Smith**: In the nearly three years leading up to the Class Period, ███



59. Upsher-Smith's ███████████████████████████████

60. Even today, ███████████████████████████████

─────────────────

[8] ███████████████████████████████

61. **Teva:** ███████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████



62. Teva's ██████████████████████████████████████████

████████████████████████████████████████

63. Even today, █████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████

64. **Par:** ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



65. Par's ███████████████████████████████████████

██████████████████████████████████

66. Even today, █████████████████████████████████

67. As shown in the charts below, Defendants' price increases coincide with increases reported by the Centers for Medicare & Medicaid Services in early 2014:





3.   **There are no shortages or other market changes that would justify the price increases.**

68.   There are no potential drug shortages or supply disruptions, or any other lawful market phenomena, to explain the price increases.  Federal law requires mandatory drug shortage reporting for drug manufacturers.[9]

69.   Baclofen is not listed on the FDA's list of Current and Resolved Drug Shortages and Discontinuations Reported to FDA.  Baclofen also does not appear on any archived lists of the American Society of Health-System Pharmacists ("ASHP") Current Shortage Bulletins from 2012 through today, nor does it appear on the current list of ASHP Resolved Shortage Bulletins (which includes drug shortages dating back to August 2010).  None of the Defendants reported any drug shortages or supply disruptions to the FDA in explanation for the supracompetitive pricing of baclofen.

70.   Nor does any change in marketplace explain the rising prices—███████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ █████████████████████████████████████

─────────────────────

[9] Food and Drug Administration Safety and Innovation Act of 2012, Pub. L. No. 112-144, §§ 1001-1008, 126 STAT. 995, 1099-1108.



**D.    Defendants' Anticompetitive Activities**

71.    During the Class Period, Defendants conspired, combined, and contracted to fix, raise, maintain, and stabilize prices at which baclofen would be sold, which had the intended and actual effect of causing Plaintiffs and the other members of the proposed Class to pay artificially inflated prices above prices that would exist if a competitive market had determined prices for baclofen.

**1.    Defendants have ample opportunities to communicate through trade organizations, and have availed themselves of those opportunities to collude.**

72.    The industry intelligence-gathering reporting firm *Policy and Regulatory Report* has reportedly obtained information regarding the investigation of generic drug companies by the DOJ, and has indicated that the DOJ is investigating the extent to which trade organizations have been used as forums for collusion between sales personnel among competing generic drug companies.[10]

73.    For example, the Generic Pharmaceutical Association ("GPhA") is the "leading trade association for generic drug manufacturers."[11]  GPhA was formed in 2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

---

[10] Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up food chain*, FIERCEPHARMA (Aug. 7, 2015), *available at* http://www.fiercepharma.com/story/actavis-gets-subpoena-doj-probe-generic-pricing-moves-food-chain/2015-08-07.

[11] Ass'n for Accessible Medicines, *The Association*, *available at* http://www.gphaonline.org/about/the-gpha-association.  While MDL 2724 has been pending, the GPhA changed its name to the Association for Accessible Medicines.  *See* Russell Redman, *New name for Generic Pharmaceutical Association*, CHAIN DRUG REVIEW (Feb. 14, 2017), *available at* http://www.chaindrugreview.com/new-name-for-generic-pharmaceutical-association/.

74.    GPhA's website touts, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry" and lists its "valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[12]  GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."

75.    Several of Defendants' high-ranking corporate officers have served on GPhA's Board of Directors, including Teva's Allan Oberman and Debra Barrett, and Par's Tony Pera. Jeff Glazer, who has pleaded guilty to federal criminal charges relating to the price fixing and other anticompetitive activity concerning generic pharmaceuticals, of Heritage Pharmaceuticals, also served on GPhA's Board of Directors during the same time period.

76.    Defendants each attended the GPhA meetings shortly before and during the Class Period, including the Fall Technical Conference in Bethesda, Maryland, from October 28-30, 2013, and the annual meeting in Orlando, Florida, on February 19-21, 2014.

77.    Around this time, Defendants also attended events hosted by the National Association of Chain Drug Stores ("NACDS"), including the NACDS annual meeting in Scottsdale, Arizona, from April 26-29, 2014 and the NACDS Total Store Expo in August 2014.

**2.    Industry Commentary**

78.    Comments from industry analysts suggest manufacturers' alternative explanations for the price hikes (*e.g.*, supply disruptions) are mere pretext, intended to shroud the Defendants' conspiratorial conduct and ends.  For instance, Richard Evans at Sector & Sovereign Research recently wrote: "[a] plausible explanation [for price increases] is that generic manufacturers,

---

[12] Ass'n for Accessible Medicines, *Membership*, *available at* http://www.gphaonline.org/about/membership.

having fallen to near historic low levels of financial performance are cooperating to raise the prices of products whose characteristics – low sales due to either very low prices or very low volumes – accommodate price inflation."[13]

79.    In 2015 the *Financial Times* reported on Defendant Mylan's planned merger with Teva and quoted Mylan as cautioning that it could be blocked by regulators concerned "about pricing power and potential for drug shortages."[14]

80.    One study concluded that in 2014, "292 generic medication listings went up by 10% or more, 109 at least doubled in price and 14 went up by ten or more times in price that year."[15]  The GAO Report also noted similar "extraordinary price increases" across many generic drugs in recent years that could not be linked to any particular cause.

## E.    Government Investigations

81.    Defendants' conduct in generic drug pricing is under investigation by the federal government, including the United States Senate and DOJ, as well as state governments.

82.    Following the DOJ opening its criminal investigation into Defendants' conduct on or about November 3, 2014, grand jury subpoenas have been issued to at least 14 generic drug companies.  Recently, generic drug manufacturer Perrigo Company plc disclosed in a press release that "search warrants were executed at the Company's corporate offices associated with

---

[13] *See* Ed Silverman, *Generic Drug Prices Keep Rising, but is a Slowdown Coming?*, WALL STREET JOURNAL (Apr. 22, 2015), *available at* http://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming/; Sector & Sovereign Research Note (Apr. 21, 2015), *available at* http://www.sector-sovereign.com/abccahmck-us-generic-inflation-continues-in-1q15/.

[14] David Crow, *Teva bids for Mylan amid pressure on copycat drugmakers,* THE FINANCIAL TIMES (May 12, 2015), *available at* https://www.ft.com/content/8ff2fc5a-f513-11e4-8a42-00144feab7de.

[15] David Belk, MD, *Generic Medication Prices*, TRUE COST OF HEALTH-CARE *available at* http://truecostofhealthcare .net/generic_medication_prices/.

an ongoing investigation by the U.S. Department of Justice Antitrust Division related to drug pricing in the pharmaceutical industry."[16]  The press release also noted that, "As has been previously disclosed by a number of companies, the Antitrust Division has been looking at industry-wide pricing practices."

83.    The 2017 annual report from Endo International plc, Defendant Par's parent, states that it received interrogatories and subpoenas *duces tecum* from the State of Connecticut Office of Attorney General in December 2015, requesting information regarding pricing of certain of its generic products.  Par had previously reported that it had received a subpoena from the DOJ relating to communications with competitors concerning certain generic pharmaceutical products.

84.    On June 21, 2016, Teva received a subpoena from the DOJ seeking documents and other information relating to the marketing and pricing of certain of Teva's generic products and communications with competitors about such products.

85.    The fact that these companies or their employees received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's Antitrust Division Manual.   Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."[17]  The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division.[18]  "The DAAG [Deputy Assistant Attorney General] for

---

[16] Perrigo Website, Press Release, *Perrigo Discloses Investigation* (May 2, 2017), *available at* http://perrigo.investorroom.com/2017-05-02-Perrigo-Discloses-Investigation.

[17] U.S. Dep't of Justice, ANTITRUST DIVISION MANUAL (5th ed. 2015) at III-82.

[18] *Id.*

Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General.  If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation."[19]  "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[20]  Thus, Defendants' and their representatives' receipt of federal grand jury subpoenas is an indication that antitrust offenses have occurred.

86.    That a target has reportedly applied for leniency is also significant.  As the DOJ notes on its web site (http://www.justice.gov/atr/frequently-asked-questions-regarding-antitrust-divisions-leniency-program):

> **5. Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?**
>
> Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter. Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.

---

[19] *Id.* at III-83.

[20] *Id.*

The DOJ further provides that the leniency applicant must also satisfy the following condition, among others, to avail itself of the government's leniency: "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials." *Id.*

87.    On December 12, 2016, the DOJ filed the first two criminal charges stemming from this investigation.  *See United States of America v. Jeffrey A. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa.); *United States of America v. Jason T. Malek,* No. 2:16-cr-00508-RBS (E.D. Pa.). These cases allege that these former senior executives of generic drug maker Heritage Pharmaceuticals Inc. violated Section 1 of the Sherman Act by participating in conspiracies to fix prices, rig bids and allocate customers for generic glyburide and doxycycline.  On January 9, 2017, both Mr. Glazer and Mr. Malek pleaded guilty to the charges.  Sentencing for both Mr. Glazer and Mr. Malek was originally set for April 2017 but was later rescheduled to September 2017 as they continue to cooperate with the DOJ.  Evidence reportedly unearthed in a related case shows that Mr. Malek compiled a large list of generic drugs and instructed employees to contact competitors to reach agreement to increase prices and allocate customers, and that some of its competitors were willing to reach such agreement.

88.    The DOJ has intervened in numerous civil antitrust actions alleging price fixing, bid rigging, and market allocation of generic pharmaceuticals due to the fact that these cases overlap with the DOJ's ongoing criminal investigation.  For example, in a civil antitrust action related to the generic pharmaceutical propranolol, the DOJ intervened and requested a stay, stating that "the reason for the request for the stay is the government's ongoing criminal investigation and overlap of that investigation and this case," and that "the government's ongoing investigation is much broader than the [Malek and Glazer] informations that were

unsealed."[21]  The DOJ has filed a brief with the United States Judicial Panel on Multidistrict

Litigation noting that, "The complaints in those civil cases – which typically allege that a group

of generic pharmaceutical companies violated Section 1 of the Sherman Act by conspiring to fix

prices and allocate customers for a particular drug – overlap significantly with aspects of the

ongoing criminal investigation."[22] The DOJ also recently filed a motion for a stay of discovery in

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*, noting that "Evidence uncovered

during the criminal investigation implicates other companies and individuals (including a

significant number of the Defendants here) in collusion with respect to doxycycline hyclate,

glyburide, and other drugs (including a significant number of the drugs at issue here)."[23]

89.     The steep climb of generic drug prices of late is an issue of national importance.

In addition to the DOJ subpoenas and criminal charges, Congress has taken a keen interest in the

matter.  For instance, in October 2014, Senator Bernie Sanders (I-VT) and Representative Elijah

E. Cummings (D-MD) launched an investigation into the inexplicably soaring generic drug

prices.

90.     Sen. Sanders and Rep. Cummings issued a joint press release at the start of the

investigation indicating that they had issued letters to 14 pharmaceutical companies, advising

"[w]e are conducting an investigation into the recent staggering price increases for generic drugs

used to treat everything from common medical conditions to life-threatening illnesses."  The

bicameral duo noted the "huge upswings in generic drug prices that are hurting patients" are

---

[21] *See* Transcript of Hearing, *FWK Holdings, LLC v. Actavis Elizabeth, LLC*, No. 16-cv-9901, ECF 112 (S.D.N.Y. Feb. 21, 2017).

[22] *See* Memorandum of Amicus Curiae United States of America Concerning Consolidation, *In re Generic Digoxin and Doxycycline Antitrust Litig.*, MDL 2724, ECF 284 (J.P.M.L. Mar. 10, 2017).

[23] *See* Intervenor United States' Motion to Stay Discovery, *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL 2724, ECF 279 (E.D. Pa. May 1, 2017).

having a "'very significant'" impact threatening pharmacists' ability to remain in business.  The

legislators made this issue a priority because, for some of their constituents, "the outrageous

price hikes are preventing patients from getting the drugs they need."[24]

91.    The U.S. Senate HELP Committee conducted a hearing on November 20, 2014,

"Why Are Some Generic Drugs Skyrocketing in Price?"[25]  The committee heard testimony from

one pharmacist, who explained "it was extremely concerning when about a year ago, pharmacies

began noticing a rash of dramatic price increases for many common, previously low-cost generic

drugs."[26]  Using generic digoxin and doxycycline as examples of two of the generic drugs with

price spikes, the pharmacist explained:

> A recent example from my own experience is the price of Digoxin—
> a drug used to treat heart failure. The price of this medication
> jumped from about $15 for 90 days' supply, to about $120 for 90
> days' supply. That's an increase of 800%. One of my patients had
> to pay for this drug when he was in the Medicare Part D coverage
> gap in 2014. Last year, when in the coverage gap he paid the old
> price. This year he paid the new price. Needless to say, the patient
> was astounded, and thought I was overcharging him. The patient
> called all around to try to get the medicine at the old, lower price,
> but to no avail. This caused him lots of stress and time, and caused
> us lots of stress and time in explaining the situation, reversing, and
> rebilling the claim. This example is typical of how these price spikes
> put consumers and pharmacists in a bad position, often grasping at
> straws for explanations. And all the while, everyone pays more,
> including the patient, the pharmacy, and the insurer (often the
> federal government).[27]

---

[24] Press Release, *Congress Investigating Why Generic Drug Prices Are Skyrocketing* (Oct. 2, 2014), *available at* http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[25] Press Release, *Drugmakers Mum on Huge Price Hikes* (Nov. 20, 2014), *available at* http://www.sanders.senate.gov/newsroom/press-releases/drugmakers-mum-on-huge-price-hikes.

[26] *Why are Some Generic Drugs Skyrocketing in Price?: Hearing Before the Subcomm. on Primary Health & Aging* of the S. Comm. on Health, Educ., Labor & Pensions, 113th Cong. (2014) (testimony of Rob Frankil, Independent Pharmacist & Member of the Nat'l Community Pharmacists Ass'n), *available at* http://www.help.senate.gov/imo/media/doc/Frankil .pdf.

[27] *Id.*

92.     Additional congressional hearings concerning the dramatic rise of generic drug prices were held in December 2015 and February 2016.  At the U.S. Senate Special Committee on Aging's December 9, 2015 hearing, the Director of the Drug Information Service of the University of Utah noted the deleterious effect these drug prices have had on patient access and healthcare: "[w]hen medication prices increase in an unpredictable and dramatic way, this can create an access issue for hospitals and patients.  If hospitals cannot afford to stock a product in the same amount due to price increases, this effectively creates a shortage."

93.     On February 24, 2015, Senator Sanders and Congressman Cummings sent a letter requesting that the Office of the Inspector General (OIG) of the Department of Health and Human Services "examine recent increases in the prices being charged for generic drugs and the effect these price increases have had on generic drug spending within the Medicare and Medicaid programs."[28]  The OIG responded to the request on April 13, 2015, advising would examine pricing for the top 200 generic drugs to "determine the extent to which the quarterly [Average Manufacturer Pricing] exceeded the specified inflation factor."[29]

94.     According to a November 3, 2016 *Bloomberg* report: "U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion" and that, according to the DOJ, "the first charges could emerge by the end of the year."  As predicted, on December 12, 2016, the DOJ charged two generic industry

---

[28] Letter from Sen. Bernard Sanders & Rep. Elijah E. Cummings, U.S. Cong., to Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs. (Feb. 24, 2015), *available at* http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[29] Letter from Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs., to Sen. Bernard Sanders (Apr. 13, 2015), *available at* http://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

executives with criminal counts related to price collusion for generic doxycycline hyclate and glyburide.

95.    On December 15, 2016, several states' attorneys general, led by the State of Connecticut Office of Attorney General, filed a civil action in the U.S. District Court for the District of Connecticut for violation of the Sherman Act against Heritage Pharmaceuticals, Inc. and other sellers of generic doxycycline hyclate and glyburide.  The action filed by the attorneys general is styled *The State of Connecticut, et al. v. Aurobindo Pharma USA, Inc., Citron Pharms, LLC, Mylan Pharmaceuticals USA, Inc. and Teva Pharmaceuticals USA, Inc., Heritage Pharmaceuticals, Inc. and Mylan Pharmaceuticals, Inc.* ("State AG Action").

96.    According to the State AG Action, the information developed through its investigation (which is still ongoing) uncovered evidence of a broad, well-coordinated, and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States.  Although the State AG Action currently focuses on doxycycline hyclate and glyburide, it alleges that the Plaintiff States have uncovered a wide-ranging series of conspiracies implicating numerous different generic pharmaceuticals and competitors.

97.    The DOJ and State AG investigations of Defendants' alleged price-fixing conduct in the generic pharmaceutical industry are ongoing.  The DOJ's Spring 2017 Division Update notes that:

> Millions of Americans purchase generic prescription drugs every year and rely on generic pharmaceuticals as a more affordable alternative to brand name medicines.  The Division's investigation into the generics market, however, has revealed that some

executives have sought to collude on prices and enrich themselves
at the expense of American consumers.[30]

## VI.    THE BACLOFEN MARKET IS HIGHLY SUSCEPTIBLE TO COLLUSION

98.    Because Defendants' anticompetitive conduct constitutes a conspiracy to fix

prices, which is a *per se* violation of Section 1 of the Sherman Antitrust Act, Plaintiffs need not

define a relevant market.   However, there are features of the market relevant to this case that

show both (i) that the market is susceptible to collusion and (ii) that the price increases were in

fact the result of collusion and not the result of conscious parallelism.

99.    The factors necessary to show that a market is susceptible to collusion are present

in this case:

   (1)    **High Level of Industry Concentration** – A small number
          of competitors (Defendants) control a significant market
          share for baclofen, as detailed above.  At the outset of the
          Class Period, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

   (2)    **Sufficient Numbers to Drive Competition** – While the
          market for baclofen tablets had a small enough number of
          competitors to foster collusion, the number of makers was
          large enough that – given decades of experience with
          competitive generic pricing, and accepted models of how
          generic companies vigorously compete on price – one
          would have expected prices to remain at their historical,
          near direct cost levels.  With the number of generic
          competitors such as there were here, historical fact and
          accepted economics teaches that – absent collusion – prices
          would remain at competitive levels.

   (3)    **High Barriers to Entry** – The high costs of manufacture,
          intellectual property, and expenses related to regulatory
          approval and oversight are among the barriers to entry in
          the generic drug market.  By insulating against new
          entrants, these barriers to entry and others increase the

---

[30] DOJ Website, Division Update Spring 2017 (Mar. 28, 2017), *available at*
https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-
individual-and-corporate-guilty-pleas-collusion-industries-where-products.

market's susceptibility to a coordinated effort among the dominant players to maintain supracompetitive prices.

(4) **High Inelasticity of Demand** – For the hundreds of thousands of baclofen prescriptions written annually, it is a necessity that must be purchased regardless of price hikes. This makes demand for baclofen highly inelastic. Defendants can significantly raise baclofen prices with minimal effect on quantity thus increasing overall revenue.

(5) **Lack of Substitutes** – While there are other drugs on the market for the treatment of high blood pressure and kidney disease is prescribed, there are significant barriers to change treatments.

(6) **Commoditized Market** – Defendants' baclofen products are fully interchangeable because they are bioequivalent to one another by FDA standards. Thus, all manufactured versions of baclofen are therapeutically equivalent to each other and pharmacists may substitute one for another interchangeably.

(7) **Absence of Departures from the Market** – There were no departures from the market that could explain the price increases.

(8) **Absence of Non-Conspiring Competitors** – Defendants have maintained supracompetitive pricing for baclofen tablets throughout the Class Period. Thus, Defendants have oligopolistic market power in the baclofen market, which enables them to increase prices without loss of market share to non-conspirators.

(9) **Opportunities for Contact and Communication Among Competitors** – Defendants participate in the committees and events of the GPhA, which provides and promotes opportunities to communicate. The grand jury subpoenas to Defendants targeting inter-Defendant communications, further supports the existence of communication lines between competitors with respect to, among other things, generic pricing.

(10) **Size of Price Increases** – The magnitude of the price increases involved in this case further differentiates them from parallel price increases. Oligopolists seeking to test market increases need to take measured approaches. █

- 32 -

██████████████████████████     A rational oligopolist, when unaided with the certainty that its ostensible competitors would follow, would not do so.

(11)  **Reimbursement of Generic Drugs** – This market, as with many generic markets, has institutional features that would inhibit non-collusive parallel price increases. The reimbursement for generic pharmaceuticals to retail pharmacies is limited by MAC pricing, which is based on the lowest acquisition cost for each generic pharmaceutical paid by retail pharmacies purchasing from a wholesaler for each of a pharmaceutical's generic equivalent versions. As a result, the usual inhibition of an oligopolist to unilaterally raise prices is embedded in the generic reimbursement system.

100.    Though it is not necessary to allege a relevant market, at all relevant times, Defendants had substantial market power (*i.e.*, monopoly power) with respect to baclofen because they had the power to maintain the price of the drug at supracompetitive levels without losing so many sales as to make the supracompetitive price unprofitable.

101.    A small but significant, non-transitory price increase above the competitive level for baclofen by Defendants would not have caused a loss of sales sufficient to make the price increase unprofitable.

102.    Defendants sold baclofen at prices well in excess of marginal costs, and in excess of competitive price, and enjoyed high profit margins.

103.    Defendants, at all relevant times, enjoyed high barriers to entry with respect to competition in the relevant product market due to regulatory protections and high costs of entry and expansion.

104.    To the extent that Plaintiffs are legally required to prove substantial market power circumstantially by first defining a relevant product market, Plaintiffs allege that the relevant market is baclofen or narrower markets contained therein. During the relevant time, Defendants

were able to profitably maintain the price of baclofen tablets substantially above competitive levels.

105.    The relevant geographic market is the United States and its territories.

106.    Throughout the Class Period, Defendants held approximately ████████ of the relevant market, implying a substantial amount of market power.

107.    Through their market dominance, Defendants' have been able to substantially foreclose the market to rival competition, thereby maintaining and enhancing market power and enabling Defendants to charge Plaintiffs and the proposed Class Members inflated prices above competitive levels for baclofen tablets through unlawful price collusion.

## VII.    CLASS ACTION ALLEGATIONS

108.    Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), Plaintiffs bring this action on behalf of a Class defined as:

> All persons or entities that directly purchased generic baclofen tablets (10 and 20 mg) from one or more of Defendants in the United States and its territories and possessions at any time during the period from February 1, 2014, through the present (the "Class Period").

> Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, judicial officers and their personnel, and all governmental entities.

109.    Members of the Class are so numerous that joinder is impracticable.  Plaintiffs believe that there are dozens of Class Members, geographically dispersed throughout the United States, such that joinder of all Class Members is impracticable.  Further, the Class is readily identifiable from information and records maintained by Defendants.

110.    Plaintiffs' claims are typical of, and not antagonistic to, the claims of the other Class Members, and there are no material conflicts with any other member of the Class that

would make class certification inappropriate. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants.

111.    Plaintiffs will fairly and adequately protect and represent the interests of the Class and Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class.

112.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation.

113.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class Members because Defendants have acted on grounds generally applicable to the entire Class.  Thus, determining damages with respect to the Class as a whole is appropriate.  The common applicability of the relevant facts to claims of Plaintiffs and the proposed class is inherent in Defendants' wrongful conduct, because the overcharge injuries incurred by Plaintiffs and each member of the proposed class arose from the same collusive conduct alleged herein.

114.    The common legal and factual questions do not vary among class members and may be determined without reference to individual circumstances, and include, but are not limited to, the following:

> (a)    Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to eliminate competition and thereby increase the prices of baclofen tablets in the United States;
>
> (b)    The duration and extent of the alleged contract, combination, or conspiracy between and among Defendants and their co-conspirators;
>
> (c)    Whether Defendants and their co-conspirators were participants in the contract, combination, or conspiracy alleged herein;

(d)     The effect of the contract, combination, or conspiracy on the prices of baclofen tablets in the United States during the Class Period;

(e)     Whether Defendants' conduct caused supracompetitive prices for baclofen tablets;

(f)     Whether, and to what extent, the conduct of Defendants and their co-conspirators caused injury to Plaintiffs and other members of the Class; and

(g)     Whether the alleged contract, combination, or conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

115.     Treatment as a class action is the superior method for the fair and efficient adjudication of this controversy, as it will permit numerous similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, avoiding unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding as a class action, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs any potential difficulties in management of this class action.

116.     Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VIII.   ANTITRUST INJURY

117.     During the Class Period, Plaintiffs and Class Members directly purchased baclofen tablets from Defendants.  Because of the Defendants' anticompetitive conduct, Plaintiffs and Class Members were forced to pay more for baclofen tablets than they otherwise would have, and thus have suffered substantial overcharge damages at the hands of Defendants. This is a cognizable antitrust injury and constitutes harm to competition under the federal antitrust laws.

118.    Defendants' unlawful conduct has successfully eliminated competition in the market, and Plaintiffs and Class Members have sustained, and continue to sustain, significant losses in the form of artificially inflated prices paid to Defendants.  The full amount of such overcharge damages will be calculated after discovery and upon proof at trial.

119.    Defendants, through their unlawful conduct alleged herein, reduced competition in the baclofen market, increased prices, reduced choice for purchasers, and caused antitrust injury to purchasers in the form of overcharges.

120.    Because Defendants' anticompetitive conduct is ongoing, Plaintiffs and the Class continue to pay supracompetitive prices for baclofen through the present.

## IX.    CLAIM FOR RELIEF – VIOLATION OF SECTION 1 OF THE SHERMAN ACT

121.    Plaintiffs repeat and re-allege the foregoing as though fully set forth herein.

122.    In violation of Section 1 of the Sherman Antitrust Act, Defendants entered agreements with one another concerning the pricing of baclofen in the United States.  This conspiracy was *per se* unlawful price-fixing, or alternatively, was an unlawful restraint of trade under the rule of reason.

123.    Each of the Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Defendants' anticompetitive acts were intentional, were directed at the sales of baclofen tablets in the United States, and had a substantial and foreseeable effect on interstate commerce by raising and fixing baclofen prices throughout the United States.

124.    The conspiracy had its intended effect, because Defendants have benefited—and continue to benefit—from their collusion and the elimination of competition, both of which artificially inflated the prices of baclofen.

125.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects upon commerce in the United States:

      a.      Prices charged to and paid by Plaintiffs for baclofen were artificially raised, fixed, maintained, or stabilized at supracompetitive levels;

      b.      Plaintiffs were deprived of the benefits of free, open, and unrestricted competition in the sale of baclofen in the United States market; and

      c.      Competition in establishing the prices paid for baclofen was unlawfully restrained, suppressed, or eliminated.

126.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class Members have been injured in their business and property in that they have paid more for baclofen than they otherwise would have paid in the absence of Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial, but is believed to be in the hundreds of millions of dollars classwide.

127.    Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

128.    There is no legitimate, non-pretextual, procompetitive business justification for Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such a purpose.

129.    Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Class Members pray for relief from this Court and request:

A.    Certification as a Class Action pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiffs as Class Representatives and their counsel of record as Class Counsel;

B.      Adjudication that the acts alleged herein constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

C.      A judgment against Defendants, jointly and severally, for the damages sustained by Plaintiff and the Class defined herein, and for any additional damages, penalties, and other monetary relief provided by applicable law, including treble damages;

D.      An award to Plaintiffs and Class Members of pre-judgment and post-judgment interest at the highest legal rate provided by law from and after the date of service of this Complaint;

E.      An award to Plaintiffs and Class Members of the costs of this suit, including reasonable attorney fees; and

F.      An award of any further relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby request a jury trial on all claims so triable.

Dated May 9, 2017

Respectfully submitted,

NASTLAW LLC

By: _____
Dianne M. Nast

Dianne M. Nast (PA Bar No. 24424)
Erin C. Burns (PA Bar No. 89742)
1101 Market Street
Suite 2801
Philadelphia, PA 19107
215-923-9300
215-923-9302 (facsimile)
dnast@nastlaw.com
eburns@nastlaw.com

*Interim Co-Lead Counsel in MDL 2724*

HAGENS BERMAN SOBOL SHAPIRO LLP
Thomas M. Sobol
David S. Nalven
Lauren Guth Barnes
55 Cambridge Parkway, Suite 301
Cambridge, Massachusetts 02142
617-482-3700
617-482-3003 (fax)
tom@hbsslaw.com
davidn@hbsslaw.com
lauren@hbsslaw.com

*Member of Plaintiffs' Steering Committee in MDL 2724*

HAGENS BERMAN SOBOL SHAPIRO LLP
Barbara A. Mahoney
Jerrod C. Patterson
1918 Eighth Ave., Ste. 3300
Seattle, WA 98101
(206) 623-7292
(206) 623-0594 (fax)
barbaram@hbsslaw.com
jerrodp@hbsslaw.com

VANEK, VICKERS & MASINI, P.C.
Joseph M. Vanek
David P. Germaine
55 W. Monroe
Suite 3500

BERGER & MONTAGUE, P.C.
David F. Sorensen
Zachary D. Caplan
Christina M. Black
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
(215) 875-4604 (fax)
dsorensen@bm.net
zcaplan@bm.net
cblack@bm.net

*Member of Plaintiffs' Steering Committee in MDL 2724*

FARUQI & FARUQI, LLP
Peter Kohn
Joseph T. Lukens
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
(215) 277-5770
(215) 277-5771 (fax)
pkohn@faruqilaw.com
jlukens@faruqilaw.com

TAUS, CEBULASH & LANDAU, LLP
Barry S. Taus
Kevin Landau
Archana Tamoshunas
80 Maiden Lane, Suite 1204

Chicago, IL 60603
(312) 224-1500
jvanek@vaneklaw.com
dgermaine@vaneklaw.com

RADICE LAW FIRM
John D. Radice
April D. Lambert
A. Luke Smith
34 Sunset Blvd
Long Beach, NJ  08008
(646) 245-8502
(609) 385-0745 (fax)
jradice@radicelawfirm.com

COHEN MILSTEIN SELLERS
& TOLL PLLC
Sharon K. Robertson
Donna M. Evans
88 Pine Street, 14th Floor
New York, NY 10005
(212) 838 7797
(212) 838 7745
srobertson@cohenmilstein.com
devans@cohenmilstein.com

*Counsel for FWK Holdings, L.L.C. and the
Proposed Direct Purchaser Class*

New York, NY 10038
(212) 931-0704
btaus@tcllaw.com
klandau@tcllaw.com
atamoshunas@tcllaw.com

*Counsel for Rochester Drug Co-Operative,
Inc. and the Proposed Direct Purchaser
Class*